Good morning, Your Honors. I represent the petitioner, Margaret Fisher. She's a 53-year-old woman. Could we get your name for the record, please? We're making an audio recording. Lindsay Holm, thank you. Thank you. She's a 53-year-old woman with a 30-year work history. I'd like to reserve two minutes for rebuttal. ALJ in this case determined that Ms. Fisher was capable of working full-time as a crab processor, a laundry sorter, or a final assembler. Today, I'd like to focus on two broad categories of legal error that ALJ committed in reaching that decision. First, he dismissed the opinions of Ms. Fisher's doctors and counselors. And second, he rejected Ms. Fisher's credibility. But before I get to that, I'd like to turn the Court's attention to the testimony of the vocational expert and the medical experts at page 85-95 of the record. The vocational expert testified that if Ms. Fisher regularly missed more than one day of work per month, she would be fired. That's at page 83. The agency's medical expert, Dr. Clayton, testified that, quote, Ms. Fisher would have a markedly difficult time showing up and meeting the basic attendance requirements of a job. And that's at page 88. Meanwhile, Ms. Fisher testified that she lives in near-total isolation. She spends a day- Excuse me, these page numbers you're giving me, are they the excerpts? That's correct, Your Honor. Ms. Fisher testified that she lives in near-total isolation. She spends significant time at home staring at the walls or taking naps. And she struggles to attend two hours of schooling per day. And still, ALJ concluded that she could show up to work eight hours a day, five days a week, on a regular basis. She's taking college classes? She was taking two community college courses at the time of the hearing, Your Honor. Are they calculus, did I recall correctly? That's correct. Chemistry? That's correct. What does that tell us? That she's able to go to college and take challenging courses? It tells us she's certainly attempting to overcome considerable odds to attend school, which she failed. The school fired her. Just as any employer would. This is 20 to 30 percent of their attendance requirement as a court performer. Did the school throw her out? I thought she was just failing her course but could take it over. Your Honor, I'd submit that failing your courses is like being fired. Well, if they throw you out because you don't show up, that's one thing. If she's not doing well because she doesn't understand the subject matter, that's a different thing. There aren't any facts in the record. I do know that she's not in community college any longer. Did they expel her? No. There's no evidence of that in the record. That's what I thought you meant when you said they fired her. Sorry about that. Turning to ALJ's treatment of Dr. Janine Shaw, I just remind the Court that Ms. Fisher was treating Dr. Fromm for almost three years by the time of the second hearing. Dr. Shaw determined that it was impossible for Ms. Fisher to work given the combination of her depression and her fatigue. She cited emotional struggles and suicidal ideation, and she found significant impairment in Ms. Fisher's ability to reason, to make decisions, and to tolerate stress. As this Court knows, her opinion is entitled to special weight, particularly given the longstanding doctor-patient relationship. Even so, the ALJ marginalized Dr. Shaw's opinion at each turn. At first, he rejected Dr. Shaw's opinion because he apparently disagreed that Ms. Fisher was actively suicidal at a particular appointment in October 2006, primarily because at that time she reported not having a specific plan in place to take her life. Notably, at that very same appointment, Dr. Shaw set up a safety plan with Ms. Fisher to ensure that she would not take her life between that appointment and the next. I'd also note that there's no chart note indicating that Ms. Fisher was malingering or exaggerating her condition, and no doctor has required that she have a particular plan to carry out suicide. Finally, I'd note that Judge Zille has already remanded this case once because Judge Detloff failed to consider Ms. Fisher's suicidal ideation. Other than his sheer disbelief, there's simply no clear and convincing reason to reject Dr. Shaw's opinion on this basis. Next, the ALJ discarded Dr. Shaw's opinion on what he termed Ms. Fisher's relative success in college, as we've just discussed, and her ability to, quote, live independently. Now, there's no dispute that Ms. Fisher lived alone, but to say that she lived independently implies some level of function that simply does not exist on this record. I didn't get a clear picture of how she lived. She used the word cabin, and in Fairbanks, Alaska, we have a very specific meaning for that. It's one room. It means no running water. That's the critical distinction. But my impression is she has running water. She just doesn't use it very much. She has a bathroom sink, Your Honor. She doesn't have a kitchen sink. The home is not weatherized. It's kind of like a motel room, no kitchen sink. You use a hot plate if you want to heat something up. Yes, she has a microwave. The point being not that she's just poor. She has running water. She has running water. But it's not insulated. But it's not insulated. Does it have heat? No. She wears three layers of clothing to keep warm. No heat. No heat. I had the impression that she said somewhere she only washes the dishes once a year. I think it was once a month. She waits until she runs out, and then she takes them to her son's house where she washes them if her granddaughter is going to visit. Oh, kind of like a man living alone. Perhaps, Your Honor. The point being that her level of function is demonstrated by the way she lives at home. She neglects chores. She can't remember the last time she cleaned her toilet. When she does do yard work, perhaps for an hour on the weekend, she has to spend the next day recovering from that task. The government cites the Turner case, it's a 2010 case, for the proposition that living alone somehow suggests that a person is not disabled. But in that case, the man lived alone on a cattle ranch, branding cattle. I submit that the facts of that case are just simply an opposite to those here. I'm still not clear what we deduce from the fact that she lives in this situation. What does that tell us? Your Honor, I think it's indicative of her level of functioning because her testimony was along the lines of staring at the walls and unable to concentrate, neglecting chores that one would think a person would be able to do if they were able to go to work every day. You know, I once represented a group of female firefighters who all lived in cabins.  They wanted to get firefighting jobs, no running water in the cabins. They lived alone. The cabins were unheated. And instead of being unfit, they were super fit for work. You have to be really tough to live like that. I'm just not sure what inferences to draw. What I've really got so far is the medical. She's got hepatitis and depression. Hepatitis is a deadly disease, but the treatment for it contributes to the depression, the drug you take. I just don't get a lot of the frosting on the cake here with the living alone. Sure, Your Honor. I merely bring it up because the ALJ used the fact that she lived alone and attended college as really the linchpin of his decision. The attending college looked to me like it was kind of lightweight in either direction. On the one hand, she really tries to go to college. On the other hand, she can't seem to manage it very well. But the trying suggests employability. The not managing it very well suggests unemployability. So it looks like it doesn't prove much one way or the other. That's certainly something that this panel could find. I think I raise it because the ALJ determined that that attendance at college would indicate for two hours a day, two of the days of the week she didn't manage to attend, would be indicative of her ability to work. And I'd like to pay the remaining of my own time. Thank you. Thank you very much, Ms. Holt. Mr. Lee, long time no see. You were just here a minute ago, weren't you? That's right. I'm part of the government's shutdown plan. I was going to be here anyway, and I appreciate being here. May it please the Court. Again, Your Honors, Willie Lee for the Commissioner of Social Security. I'd like to explore why Ms. Fisher was having attendance problems. Just to clarify, the record shows that she was attending college and taking courses mostly online, and there was no evidence of her failing classes until she had attended live classes. And that revealed the nature of her mental limitations, which is she's alleging mostly that she did not like interacting with people. Counsel, it looked to me from reading her chart as though she has quite a severe depression, very long-term, fairly severe depression. It's not the worst kind of depression. She's not just catatonic in bed, but pretty bad. And she also has hepatitis C. The medication for the hepatitis C causes depression. Yes. On the other hand, if you don't get medicated for hepatitis C, it's not like you're going to feel great. What's more likely is you're going to die. Kind of a problem seeing how she can work, either if she's dead or if she's too depressed. Yes, it was. Could you address that? That problem was explored in detail with Dr. Shaw, in fact. Dr. Shaw, I didn't understand why she was discounted. It looks like she's saying basically what I just said. Yes. Now, she said that before you get on the interferon to help your hepatitis C, Ms. Fisher had to address her depression. Either way, she'd have trouble mentally and physically.  And the ALJ cited that she provided no valid plausible reasons why she did not pursue such treatment. I mean, there's a gap. Assuming that she had to fix the depression first and then the hepatitis, there's a gap of one year in mental treatment from October 2007 to September 2008, roughly one year, I'm sorry. In March 2007, she terminated her mental therapy because she wanted disability benefits instead, instead of pursuing the mental treatment. In September 2008, I'm sorry. Yes, that was what I just said. She refused to deal with the Department of Social Health Services because she preferred not to deal with authority figures. But that doesn't square with her college attendance and dealing with professors and such. I'm troubled on how to deal with that in light of our cases that say when somebody doesn't get medical treatment, they should get on account of being nuts. Then it doesn't count as evidence that they must be faking their medical condition. But there's no evidence that she's mentally incapable of managing and pursuing her own treatment. I mean, she was attending college. People who are depressed have a hard time getting themselves together and doing what they need to do. Sure, but she went to college and had no trouble up until she started attending live classes. So that's the conflict here. She had trouble flunking. I'm sorry? She had trouble because she was flunking. She couldn't do the work at college. Right. That was the very last semester when she was attending live classes. But actually, the problem that she raised, there was also a financial aspect to it. ALJ actually considered that and said, well, weighing all this, it's so contradictory one way or the other, as you said earlier. And I don't agree with everything that ALJ found. I'm not asking the court to. But the point is, the key is, whether it was supported by substantial evidence, whether it was reasonable, whether there was some rational basis for making these findings. And I believe the record shows that there was. So I cited Turner to highlight the fact that a person alleging that they can't deal with people, and in addition to simply living alone, does not necessarily establish disability when, in fact, their activities show otherwise. And that's pretty much the prime reason I cited Turner, not to show that she's capable of doing what Mr. Turner did in that case, just that it's some indication of her mental ability. Now, with respect to the doctor's opinions, there was Dr. Shaw. She was the treating psychiatrist, I believe, or psychologist. She issued two opinions, one in May 2006, one in November 2006. The May 2006 opinion said that she was limited to moderate limitations in terms of directions. In the latter one, she had trouble physically and mentally. Now, even if we take that opinion as true, it's not too clear as to what those limitations would be. Having trouble with mental limitations would presumably be accommodated for in the RFC. She's limited to simple and routine tasks, possibly detailed, but sensitive to her inability to deal with people, as in Turner as well, she was limited to no public interaction or close, frequent co-worker interaction. So even though I would fully admit that Ms. Fisher's case is compelling and that what she's alleging is consistent with her activities or lack thereof, the problem is it's also consistent with the ALJ's finding of non-disability. And given those two conflicts, the ALJ makes the call. And I would argue that the RFC sufficiently accommodates whatever limitations she had. I would like to just comment on the suicide issue. This case was remanded already in order to point out, because it was pointed out, that that issue was not fully developed. On remand, the ALJ tried to develop it. There was a psychologist at the hearing, and they couldn't get much information from Ms. Fisher about it. So there is another conflict there when, you know, we've tried to pursue that avenue to develop that issue. If a claimant doesn't cooperate, what are we supposed to do? I would argue that even if you accept the evidence of her suicidal thoughts or suicide attempts, there's still no evidence as to how that affects her mental functioning. When you say you couldn't develop it, you mean she refused to discuss it, right? That's correct, Your Honor. She said that she was not comfortable discussing it in the hearing. Dr. Clayton, the medical expert psychologist, asked her a few times to explain, and she couldn't. And the ALJ, who's already been ordered to consider the issue on remand, said, I just can't work with what she testified. Therefore, to the best I can, I'm going to consider it. But because there's no evidence beyond what's already in the record, this is the best I can do. We can understand why someone would not want to talk about that in open court. Couldn't the ALJ have had some informal proceedings in chambers or something like that? I imagine he could have ordered a consultative examination for her to work with just a psychiatrist in a clinical setting in order to explore that. But the person presenting the questions at the hearing was a psychologist. So even if it wasn't in open court, it would still be made part of the record. I noticed that the ALJ relied very heavily on Dr. Gaffield, but I think he was not an M.D., was he? Wasn't he just an osteopath? Dr. Gaffield, he's at Excerpt 344. I don't know. I'm sorry, I didn't think that was going to be an issue, so I'm not sure what his medical specialty was. I thought it said D.O. next to his name. Oh, right. All these people who call themselves doctor, but they're not what a lot of us would call real doctors. A D.O. is equivalent to an M.D. It's just a different school of different approach to medicine. Bones cause everything. I mean, they're licensed to do surgery and prescribe medicine. For Social Security's purposes, a D.O. is the equivalent to a medical doctor, so he is a doctor. You only run into trouble with chiropractors, maybe, and naturopaths, holistic healers, things like that. But Dr. Gaffield was not that. Again, unless there are any other questions, I don't have much to contribute. Nothing else? I yield the rest of my time. Thank you. Thank you, Mr. White. Your Honors, Dr. Gaffield was an osteopathic physician. He noted Ms. Fisher's severe impairment and saw her roughly two years prior to the second hearing. I didn't reach two additional errors, and I'd just like to briefly set them to the court, and that's the rejection of Dr. Clark's opinion, who found Ms. Fisher with severe limitations in her ability to tolerate the pressures and expectations of a work setting, and Ms. Laverne, a counselor, a treating counselor, who saw Ms. Fisher and assigned a GAF score of 45, which is equivalent to severe symptoms. On answering the questions at the hearing that opposing counsel raised, the questions were not posed by the medical expert. They were posed by the ALJ. The medical expert didn't factor in Ms. Fisher's reluctance to discuss how she killed herself in open court. Your Honors, we do not ask for one view of the evidence over the other. We ask for the only rational view of the evidence in light of the medical evidence in this case. I ask that you remand this case for an award of benefits. Ms. Fisher has waited six years for a decision. She's taken a round-trip route to the district court. The Social Security process cannot be a heads-you-lose, tails-you-try-again system. Thank you. Thank you. The case was submitted this morning.
judges: Kleinfeld, Tashima, Silverman